850 A.2d 1192

**STATE of Maryland**

v.

**Terrence TOLBERT.**

**No. 83, Sept. Term, 2003.**

Court of Appeals of Maryland.

June 8, 2004.

540

Annabelle L. Lisic, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen. of MD, on brief), Baltimore, for Appellant.

William E. Nolan, Asst. Public Defender (Stephen E. Harris, Public Defender), Baltimore, for Appellee.

Argued before BELL, C.J., RAKER, WILNER, CATHELL, HARRELL, BATTAGLIA and JOHN C. ELDRIDGE, (Retired, specially assigned), JJ.

RAKER, Judge.

In this interlocutory appeal by the State,[1] the issue presented is whether the Circuit Court for Anne Arundel County erred in granting the defendant's motion to suppress his statements on the grounds that the statements were in violation of *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) and that the statements were involuntary. This Court issued its Per Curiam Order on February 11, 2004, reversing the Order of the Circuit Court and remanding the

---

1. Pursuant to Maryland Code (1973, 2002 Repl. Vol., 2003 Cum. Supp.) § 12–302(c)(3)(i) of the Courts and Judicial Proceedings Article, the State may appeal in the following circumstances:

    "In a case involving a crime of violence as defined in § 14–101 of the Criminal Law Article, and in cases under §§ 5–602 through 5–609 and §§ 5–612 through 5–614 of the Criminal Law Article, the State may appeal from a decision of a trial court that excludes evidence offered by the State or requires the return of property alleged to have been seized in violation of the Constitution of the United States, the Constitution of Maryland, or the Maryland Declaration of Rights."

matter for trial.[2] *State v. Tolbert,* 379 Md. 424, 842 A.2d 63 (2004). We now give the reasons for that Order.

## I.

Terrence Tolbert, appellee, was indicted by the Grand Jury for Anne Arundel County for the offenses of first degree murder, second degree murder, manslaughter, armed carjacking, armed robbery, conspiracy to commit murder, conspiracy to commit armed carjacking, conspiracy to commit armed robbery, and use of a handgun in the commission of a felony. Prior to trial, he filed a motion to suppress all oral and written statements that he made to the police on the ground that the statements were obtained in violation of the United States Constitution, Maryland Declaration of Rights, and Maryland Rules.

The Circuit Court for Anne Arundel County held an evidentiary hearing. We set forth the facts from the record of the suppression hearing.

Straughan Lee Griffin, a resident of Annapolis, was shot and killed in front of his home on September 19, 2002. His assailant[s] shot him in the head, stole his automobile, and ran over his body as they fled from the scene. The police became interested in appellee as a possible witness or suspect because they had received information that the suspects in the murder were two black males, one of whom had a missing arm; appellee is a black male who is missing one arm. On October 16, 2002, several officers went to appellee's home, where he lived with his mother. Corporal Thomas Hannon explained that the police wanted to talk to appellee and his mother about the homicide. Appellee agreed to go to the police station and answer questions. During the questioning, which lasted approximately half an hour, appellee denied that he knew any-

---

2. Maryland Code (1973, 2002 Repl. Vol., 2003 Cum. Supp.) § 12–302(c)(3) of the Courts and Judicial Proceedings Article, which provides for an appeal by the State under certain circumstances, requires an appellate court to render a decision no later than 120 days from the time the record was received in the appellate court.

thing about the murder and provided an alibi. He returned home.

Shortly after 11:00 p.m. that night, Detective David Cordle, chief investigator for the Anne Arundel County State's Attorney's Office, and two other officers went to appellee's home and offered to place his family in a hotel for the evening due to threats made to his family by the family of another suspect. Appellee's mother declined the offer. Detective Cordle asked if appellee would be willing to talk about the murder case, and appellee responded that he was not interested at that time. The police then left.

The following day, Detective Cordle contacted appellee's mother and asked if she would meet with him. Appellee's mother and sister went to the State's Attorney's Office that afternoon and met with Detective Cordle and Detective Kevin Lloyd. The detectives asked appellee's mother for her help in getting appellee to cooperate and talk with the police. Appellee's mother said that she could not force her son to talk to them but that she would encourage him to do so. Detective Cordle set up another meeting with appellee's mother for the following week. At that meeting, on October 24, 2002, Detectives Cordle and Lloyd discussed the possibility of appellee taking a polygraph examination and persuaded appellee's mother to bring him into the State's Attorney's Office the following day.

On October 25, 2002, appellee and his mother met with Detective Cordle, Detective William Johns, and Corporal Hannon at the State's Attorney's Office. No *Miranda* warnings were given. Detective Johns asked appellee several questions. At one point, appellee's mother interrupted to inquire whether she should get an attorney for her son. Detective Cordle told her that "she could do what she had to do." Detective Cordle asked appellee whether he would be willing to take a polygraph test to verify his unwavering claim that he had no involvement in the murder. Although at first reluctant, appellee agreed to take the polygraph examination.

Arrangements were made for Corporal Lloyd White to administer the polygraph test at the Maryland State Police Barracks, about one mile away. Appellee's mother drove him to the Barracks, and Detective Johns drove there separately. When Corporal White arrived, he spoke briefly with Detective Johns in the lobby and then escorted appellee to the polygraph suite in the basement. Appellee's mother left to do an errand. Corporal White explained to appellee that the test would take approximately two hours and consisted of three phases—a pre-test interview, the instrumentation phase, and a post-test interview. Appellee expressed reluctance about taking the test. After Corporal White told him that he "did not want to make him do anything he didn't want to do," appellee said that he did not want to take the test. Corporal White then escorted him back to the lobby.

Once in the lobby, appellee discovered that his mother was not present. After some time passed, appellee changed his mind about taking the polygraph test and told Corporal White that he wanted to get it over with. Corporal White then took appellee back to the polygraph suite.

Pursuant to Maryland State Police policy for the administration of polygraph examinations, Corporal White then advised appellee of his *Miranda* rights. Appellee signed a waiver of rights form at 6:05 p.m. He also signed the State Police polygraph request and release form.[3] After asking appellee some background information about his education, employment, and health, Corporal White went over the polygraph questions with appellee and then administered the actual test.

When the instrumentation phase of the test was completed, Corporal White took appellee upstairs to another office and

---

3. The release form serves a few purposes. It explains that: (1) the result (truthful, deceptive, inconclusive) of a polygraph test is not admissible as evidence in Maryland courts; (2) the polygraph examination is a voluntary process; and (3) the Maryland State police are not liable for any damages resulting from the polygraph examination or report.

did not give additional *Miranda* warnings. Corporal White told appellee that he had shown deception during the test, and appellee responded by asking whether the polygraph indicated that he had shot the victim. Corporal White asked appellee why he would ask such a question and told him that, if appellee had any involvement in the murder, he should say so. Appellee was quiet for several minutes and then admitted that he was more involved than he had said during the test. He then spoke for about five minutes, making a statement implicating himself in the murder and finally stating, "I guess it's a robbery gone bad."

After appellee made this statement, Corporal White left the room and summoned Detective Johns, telling him that appellee had confessed. Corporal White returned to the office with Detective Johns, and no additional *Miranda* warnings were given by either officer. Corporal White asked appellee if he would repeat his story to Detective Johns. Appellee nodded yes and repeated what he had told Corporal White. Following his confession, appellee was placed under arrest and transported to the police station. At the station, appellee spoke with Detective Johns and signed the notes taken by Detective Johns during the interview.

The Circuit Court ruled on the motion on September 4, 2003. The court found that appellee voluntarily went to the State's Attorney's Office and to the State police barracks and that, up until the time that appellee made the first set of statements to Corporal White, he was free to leave and a reasonable person under the circumstances would have felt free to leave. The court found that the police had made no promises to appellee in exchange for his taking the polygraph test and had not acted in a coercive manner. Considering the totality of the circumstances, the court held that appellee's statement to Corporal White was voluntary and not the product of any custodial interrogation. The court thus denied the motion to suppress the first statement.[4]

---

4. On September 18, 2003, the court clarified its ruling by holding that all of appellee's statements made to Corporal White during the post-

The court determined that appellee was in custody as of the time that Corporal White summoned Detective Johns and they asked him to repeat the statement he had made to Corporal White. The court explained that "there is no doubt in my mind that a reasonable person would not have believed that they were free to leave having just indicated that they had, or made an incriminating statement that they had killed someone." Having determined that appellee's status changed from noncustodial to custodial, the court held that the police should have repeated the *Miranda* warnings and that the "premature" administration of *Miranda* warnings, *i.e.,* the issuance of warnings prior to the time appellee was in custody, was ineffective. The court granted the motion to suppress the statements appellee made to Detective Johns—the second and third statements.

Regarding the voluntariness of the statements made to Detective Johns, the court stated as follows:

"[H]e was there for a polygraph. He agreed to go and nobody coerced him or threatened him. But he agreed to go there for the purpose of the polygraph.

I don't believe that that statement was voluntary. I believe he should have been given his *Miranda* warnings. He was not. The circumstances were different. He may have been, it's one thing when you are about to take a polygraph examination. It's a totally different circumstance once you have just made an incriminating statement to have two detectives, officers, come back and further question him."

The prosecutor requested the Circuit Court to clarify its ruling and to make clear whether the ruling related only to *Miranda* or whether it also covered voluntariness. The court elaborated as follows:

"[A]s I indicated, I think considering the totality of the circumstances, the age, the intelligence, the experience and

polygraph interview (before Detective Johns was summoned) were voluntary and admissible.

the mental capacity and the extent of the interrogation, although there was no one that threatened this individual, I think I indicated that.

There is nothing about the tactics and the inducement. There was no coercive activity on the part of the police. But I think considering the totality of the circumstances this statement was not voluntary."

The State noted a timely appeal to the Court of Special Appeals. We issued a writ of certiorari on our own initiative prior to consideration of the case by that court. 378 Md. 613, 837 A.2d 925 (2003).

## II.

On appellate review of the grant or denial of a motion to suppress, this Court looks to the record of the suppression hearing. *See White v. State,* 374 Md. 232, 249, 821 A.2d 459, 469 (2003). The first-level factual findings of the suppression court and the court's conclusions regarding the credibility of the testimony must be accepted by this Court unless clearly erroneous. *See Riddick v. State,* 319 Md. 180, 183, 571 A.2d 1239, 1240 (1990). The evidence is to be viewed in the light most favorable to the prevailing party. *See State v. Rucker,* 374 Md. 199, 207, 821 A.2d 439, 444 (2003). We "undertake our own independent constitutional appraisal of the record by reviewing the law and applying it to the facts of the present case." *See White,* 374 Md. at 249, 821 A.2d at 469 (citing *Riddick,* 319 Md. at 183, 571 A.2d at 1240).

## III.

The State argues that Tolbert was advised of his *Miranda* rights and those warnings, given to him at the police barracks prior to the polygraph examination, performed the constitutionally mandated function even though he was ad-vised of his rights before he was in custody. It is the State's position that, under the totality of the circumstances, there was no need for Detective Johns or Corporal White to re-advise appellee of his previously waived *Miranda* rights. The

State points out that appellee's three statements were made within two and a half hours of the initial advice of rights in an uninterrupted sequence of events, and all three statements were substantially the same. The State argues that nothing occurred during the two and a half hours to dilute the efficacy of appellee's initial knowing and voluntary waiver.

Appellee's claim that his statements are inadmissible because he was not advised of his *Miranda* rights depends upon his view as to the significance of the timing of the advice of rights. He contends that even though he had been fully advised of his *Miranda* rights prior to taking the polygraph examination, and he freely and voluntarily waived those rights, the police nonetheless were required to repeat the *Miranda* warnings once his status changed from noncustodial to custodial and they intended to interrogate him. Appellee claims that an individual cannot waive a right that has not yet attached, and, therefore, the police in the instant case could not rely upon appellee's pre-custodial *Miranda* waiver.

It is hard to find any adult today who has not in some way heard of *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The warnings mandated by that decision are well known and require that when an individual is taken into custody, in order to protect the privilege against self-incrimination, procedural safeguards must be employed. *Id.* at 478–79, 86 S.Ct. at 1630, 16 L.Ed.2d at 726. The police must warn any person subjected to custodial interrogation that he has a right to remain silent, that any statement he does make may be used in evidence against him, and that he has the right to the presence of an attorney, either retained or appointed. *Id.* at 479, 86 S.Ct. at 1630, 16 L.Ed.2d at 726. In the absence of these warnings, or their substantial equivalent, the prosecution is barred from using in its case-in-chief any statements obtained during that interrogation. *Id.* Although the Court stated that the warnings must be given prior to custodial interrogation, the Court did not indicate whether or when the warnings ever must be renewed.

■■■■■■■

It is important to keep in mind that which *Miranda* was designed to protect—the privilege against self-incrimination. Whether a suspect is informed of his or her rights before the suspect has been taken into custody is not determinative of whether the warnings are constitutionally sufficient.

When "custody" has attached, and when noncustodial questioning becomes "custodial" interrogation, is not always easily discernible by the police. *See State v. Burge,* 195 Conn. 232, 487 A.2d 532, 543 (1985) (observing that the precise moment when police questioning turns into custodial interrogation requiring *Miranda* warnings is often difficult to discern). Although ambiguity as to when custody attached is not sufficient to permit a statement made *after* custodial interrogation commences, it would be elevating form over substance to conclude that good faith early warnings are *per se* ineffective, even when those warnings are "sufficiently proximate" to actual custody to inform a person of his or her constitutional rights. *Id.*

It appears to be the almost unanimous view, with the exception of West Virginia,[5] that early, noncustodial *Miranda* warnings may be effective and re-warnings are not *ipso facto* required when formal custody attaches. *See, e.g., People v. Dela Pena,* 72 F.3d 767, 769 (9th Cir.1995) (*Miranda* warnings given at night were effective the following day, approximately fifteen hours later, and defendant's subsequent custodial status was not the "determining factor" in the analysis); *Jarrell v. Balkcom,* 735 F.2d 1242, 1254 (11th Cir.1984) (no violation of defendant's rights by the failure to reissue *Miranda* warnings at the time of arrest, notwithstanding that defendant confessed approximately three hours after receiving warnings when not in custody and by a different officer); *Upton v. State,* 343 Ark. 543, 36 S.W.3d 740, 744 (2001) (*Miranda* warnings and waiver were continually effective even though defendant's

---

5. *State v. Bradshaw,* 193 W.Va. 519, 457 S.E.2d 456 (1995) stands alone in requiring renewed *Miranda* warnings based solely on a suspect's change in status and on the basis of custody. We reject the reasoning in *Bradshaw* and join the overwhelming number of courts that have held to the contrary.

status changed from that of a voluntary, potential witness to that of a suspect in custody); *State v. Burge,* 195 Conn. 232, 487 A.2d 532, 543 (1985) (defendant's waiver of *Miranda* rights when he was neither a suspect nor in custody was adequate such that his confessions which were made four hours later when he was in custody were admissible); *Commonwealth v. Colby,* 422 Mass. 414, 663 N.E.2d 808, 810 (1996) (further *Miranda* warnings were not required after defendant failed polygraph examination and his status then became custodial); *State v. Monroe,* 142 N.H. 857, 711 A.2d 878, 886–87 (1998) (assuming that post-polygraph interrogation became custodial, pre-polygraph *Miranda* warnings were sufficient to protect defendant's Fifth Amendment right against self-incrimination); *State v. Rupe,* 101 Wash.2d 664, 683 P.2d 571, 581 n. 4 (1984) (no renewal of *Miranda* warnings necessary where defendant "was effectively advised of his rights shortly before becoming technically in custody").

In *Wyrick v. Fields,* 459 U.S. 42, 103 S.Ct. 394, 74 L.Ed.2d 214 (1982), the United States Supreme Court articulated a "totality of the circumstances" test for determining whether a single set of *Miranda* warnings is sufficient in the context of police interrogation that does not immediately follow those warnings. The defendant in that case was arrested, charged with rape, and released on his own recognizance. Approximately three months later, after consulting with an attorney, the defendant requested a polygraph examination. The defendant was advised of and waived his *Miranda* rights prior to taking the exam. At the conclusion of the exam, the polygraph examiner told the defendant that he had shown deception, and the defendant made inculpatory statements. Those statements were used against him at trial, and he was convicted.

On direct appeal, Fields unsuccessfully challenged the admissibility of the statements he made after he was told that his responses during the test were deceptive. *Id.* at 45, 103 S.Ct. at 395, 74 L.Ed.2d at 217. In a federal habeas proceeding, the United States Court of Appeals for the Eighth Circuit reversed, finding that the defendant had not been provided

" 'meaningfully timed Miranda warnings' " and the State had failed to prove that the defendant knowingly and intelligently waived his right to have counsel present at the post-test interrogation. *Fields v. Wyrick,* 682 F.2d 154, 160–61 (8th Cir.1982).

The Supreme Court reversed, rejecting the Eighth Circuit's *per se* rule that the police must re-advise a suspect of his rights before questioning him at the same interrogation about the polygraph test's results. *Wyrick,* 459 U.S. at 48–49, 103 S.Ct. at 396–97, 74 L.Ed.2d at 219. Such a requirement would be "an unjustifiable restriction on reasonable police questioning." *Id.* at 49, 103 S.Ct. at 397, 74 L.Ed.2d at 219. The Court stated that "Fields validly waived his right to have counsel present at 'post-test' questioning, unless the circumstances changed so seriously that his answers no longer were voluntary, or unless he no longer was making a 'knowing and intelligent relinquishment or abandonment' of his rights." *Id.* at 47, 103 S.Ct. at 396, 74 L.Ed.2d at 218. Concluding that a totality of the circumstances approach was the proper one to determine whether an individual knowingly and intelligently waived his *Miranda* rights and thus whether renewed warnings are required, *id.* at 48, 103 S.Ct. at 397, 74 L.Ed.2d at 219, the Court stated, "the questions put to Fields after the examination would not have caused him to forget the rights of which he had been advised and which he had understood moments before." *Id.* at 49, 103 S.Ct. at 397, 74 L.Ed.2d at 219.

The Supreme Court of North Carolina considered the question of whether *Miranda* warnings, properly given initially, must be repeated at subsequent interrogations. *State v. McZorn,* 288 N.C. 417, 219 S.E.2d 201 (1975), *death sentence vacated,* 428 U.S. 904, 96 S.Ct. 3210, 49 L.Ed.2d 1210 (1976). *See also State v. Mitchell,* 353 N.C. 309, 543 S.E.2d 830 (2001) (applying *McZorn* factors and holding that *Miranda* warnings had not become stale at time defendant's status changed from noncustodial to custodial). The court concluded that *Miranda* warnings, once given, do not have unlimited efficacy, but that where "no inordinate time elapses between the interrogations,

the subject matter of the questioning remains the same, and there is no evidence that in the interval between the two interrogations anything occurred to dilute the first warning, repetition of the warnings is not required." *McZorn* at 212. The answer to the question is governed by the familiar "totality of the circumstances" and the ultimate question of whether the defendant, with full knowledge of his or her legal rights, knowingly and intentionally relinquishes those rights. *Id.*

The *McZorn* court identified illustrative factors to be considered when assessing the totality of circumstances as follows:

"Courts have included the following factors, among others, in the totality of circumstances which determine whether the initial warnings have become so stale and remote that there is a substantial possibility the individual was unaware of his constitutional rights at the time of the subsequent interrogation: (1) the length of time between the giving of the first warnings and the subsequent interrogation . . .; (2) whether the warnings and the subsequent interrogation were given in the same or different places . . .; (3) whether the warnings were given and the subsequent interrogation conducted by the same or different officers . . .; (4) the extent to which the subsequent statement differed from any previous statements . . .; (5) the apparent intellectual and emotional state of the suspect."

*Id.* (citations omitted).

Many of the cases in which this issue is presented arise in the context of police polygraph examinations. In *State v. Monroe*, 142 N.H. 857, 711 A.2d 878 (1998), the defendant, not in custody, waived *Miranda* rights before taking a polygraph examination. The Supreme Court of New Hampshire stated that "[a]lthough a defendant not previously warned must receive a *Miranda* warning when he is confronted with a custodial interrogation, if he is warned prior to this moment, the Constitution does not mandate that he be warned again when the custodial interrogation actually begins." *Id.* at 886

(citation omitted). The court reiterated the commonly accepted view that the need for additional warnings is to be determined by the totality of the circumstances, and that once a defendant has made a knowing and voluntary waiver, there is no *per se* requirement to continually advise the defendant of constitutional rights. *Id.*

■ We join those jurisdictions that hold that statements made by a suspect are not inadmissible in evidence merely because the police did not repeat properly administered *Miranda* warnings previously given to the suspect when he or she was not in custody. We hold that there was no requirement for the police to re-advise appellee of his *Miranda* rights once Detective Johns entered the interview room and appellee was asked to repeat his incriminating statements. The *Miranda* warnings given prior to the polygraph were sufficiently proximate in time and place to custodial status to inform appellee of his constitutional privilege against self-incrimination. Only a short time elapsed between the time appellee was advised of his *Miranda* rights and the questioning by Detective Johns. Appellee signed a *Miranda* waiver form at 6:05 p.m. He was arrested by Detective Johns at approximately 8:00 p.m. after he repeated the incriminating statements he had made to Corporal White. He signed the notes taken by Detective Johns at the police station approximately thirty minutes after he was arrested and taken there. Thus, only about two and a half hours elapsed from appellee's *Miranda* waiver to the time he made the third statement, and only two hours elapsed between the waiver and appellee's second statement. There was no break in the chain of events and appellee was continuously in the company of the police. The officers described appellee's demeanor as calm and quiet throughout the course of their dealings. Appellee's three statements were substantially the same.

Although Corporal White brought appellee upstairs to another interview room after the instrumentation phase of the polygraph examination, appellee remained in the same building and was aware that the subsequent questioning was the

third phase of the polygraph procedure as explained by Corporal White before the test began. Although Detective Johns and Corporal White were with different police departments,[6] they were working on the same case. Detective Johns had been interviewing appellee at the State's Attorney's Office when his colleague, Detective Cordle, suggested appellee take a polygraph examination. When appellee confessed to Detective Johns, appellee was aware that Detective Johns was investigating the murder.

We conclude that there was no violation of Tolbert's rights by the failure of the police to re-advise him of the *Miranda* warnings when his status became custodial. Considering the record and the totality of the circumstances, there is nothing to suggest that Tolbert was unaware of his rights. There is simply no evidence and he makes no argument to suggest that the effectiveness of the earlier *Miranda* warnings was diminished.

## IV.

■ Following the Circuit Court's ruling that the State was required to re-advise Tolbert of his *Miranda* warnings once custody attached, the prosecutor asked the court for a ruling with respect to the voluntariness of the statements. The court ruled that, considering the totality of the circumstances, the second and third statements were not voluntary. The essence of the court's ruling is as follows:

---

**6.** Federal and state courts have held that, in most circumstances, a suspect need not be re-advised of *Miranda* rights when questioning is by officers or agents of different agencies or jurisdictions. *See, e.g., United States v. Nordling,* 804 F.2d 1466, 1471 (9th Cir.1986) (no need for Narcotics Task Force agents to administer new *Miranda* warnings only a short time after the Harbor Police had issued warnings); *United States v. Hopkins,* 433 F.2d 1041, 1045 (5th Cir.1970) (no need for re-advisement by Dallas police officer where officer's questioning touched on same subject matter and followed closely on heels of interrogation by federal agent, who had given *Miranda* warnings); *Hughes v. Commonwealth,* 87 S.W.3d 850, 853–54 (Ky.2002) (rejecting a bright-line rule that *Miranda* warnings must be repeated whenever there is a delay between the warnings and the interrogation or whenever the warnings were issued by someone other than the interrogator).

"Yes, he was there. He had been there. But he was there
for a polygraph. He agreed to go and nobody coerced him
or threatened him. But he agreed to go there for the
purpose of the polygraph. I don't believe that that state-
ment was voluntary. I believe he should have been given
his *Miranda* warnings. He was not. The circumstances
were different. He may have been, it's one thing when you
are about to take a polygraph examination. It's a totally
different circumstance once you have just made an incrimi-
nating statement to have two detectives, officers, come back
and further question him. At that point in time, I think he
should have been given his *Miranda* warnings."

The prosecutor stated to the court that he understood that the
court had ruled that *Miranda* warnings needed to have been
given anew, but argued to the court that voluntariness was a
different issue and that "[t]here are simply no coercive factors
here with regard to the voluntariness issue." The court stated
further:

"[A]s I indicated, I think considering the totality of the
circumstances, the age, the intelligence, the experience and
the mental capacity and the extent of the interrogation,
although there was no one that threatened this individual, I
think I indicated that. There is nothing about the tactics
and the inducement. There was no coercive activity on the
part of the police. But I think considering the totality of
the circumstances this statement was not voluntary."

The State argues that, under the totality of the circum-
stances, all of appellee's statements were voluntary. The
police did not subject appellee to any coercion. Appellee was
not threatened, mistreated, or given inducements to confess.
Appellee was nineteen years old, had received a high school
diploma, and suffered no mental disability. He understood
what was going on and was not under the influence of drugs or
alcohol.

Appellee asserts that his young age, severe physical disabili-
ty, and extremely shy personality support a finding of involun-
tariness. Appellee maintains that the police exerted pressure

on both his mother and him in order to get him to talk and to take a polygraph examination. Appellee testified at the suppression hearing that he went to the State's Attorney's Office because he believed doing so might stop the police from "messing with" his mother, and he decided to take the polygraph exam "to get it out of the way" and keep the police from "coming around." Appellee further claims that he agreed specifically to take a polygraph examination but never voluntarily agreed to a custodial interrogation. Finally, appellee contends that the circumstances materially changed after he made the first incriminating statement to Corporal White, who then summoned Detective Johns, because appellee was then in police custody and the officers withheld *Miranda* warnings. According to appellee, the combination of all of these circumstances made his second and third statements involuntary.

The trial court's assessment as to whether a confession was voluntary is a mixed question of law and fact. *See Winder v. State,* 362 Md. 275, 310, 765 A.2d 97, 116 (2001). This Court undertakes a *de novo* review of the trial judge's ultimate determination on the issue of voluntariness and looks to the record of the suppression hearing. *Id.* at 310–11, 765 A.2d at 116.

In Maryland, when the State intends to use a confession or admission given by the defendant to the police during custodial interrogation, the prosecution must, upon proper challenge, establish by a preponderance of the evidence that the statement satisfies the mandates of *Miranda v. Arizona,* and, that the statement is voluntary. *Winder v. State,* 362 Md. 275, 305–06, 765 A.2d 97, 113 (2001); *Lodowski v. State,* 307 Md. 233, 250, 513 A.2d 299, 308–09 (1986) (*Lodowski II*). The test for voluntariness is whether, under the totality of all of the attendant circumstances, the statement was given freely and voluntarily. *Id.* at 254, 513 A.2d at 310. The traditional test was well stated by Judge Robert C. Murphy, then Chief Judge of the Court of Special Appeals and subsequently Chief Judge of this Court, in *State v. Hill,* 2 Md.App. 594, 236 A.2d 27 (1967), as follows:

"[T]he constitutional inquiry is not whether the conduct of [the authorities] was shocking, but whether [the accused's] confession was free and voluntary, *viz.*, whether it was extracted by any sort of threats, or violence, or obtained by any direct or implied promises, however slight, or by the exertion of any improper influence.... Otherwise stated, the test of the admissibility of [a] confession is whether [the accused's] will was overborne at the time that he confessed, ... or whether his confession was the product of a rational intellect and a free will, ... or whether his statement was 'freely self-determined,'.... So that ... the question is not whether the accused was frightened, but whether his disclosures to the officers were freely and voluntarily made at a time when he knew and understood what he was saying."

*Id.* at 601–02, 236 A.2d at 30–31 (citations omitted).

Under Maryland nonconstitutional law, a confession or incriminating statement is not admissible unless the State can prove that the statement was freely and voluntarily made and not in any way the product of coercive promises or threats. *See Hillard v. State*, 286 Md. 145, 150–51, 406 A.2d 415, 418–19 (1979). We look first to see if the police made a threat, promise, or inducement. If that prong is satisfied, we look next to see whether there was a nexus between the promise or inducement and the defendant's confession. *See Winder*, 362 Md. at 311, 765 A.2d at 117.

The United States Supreme Court has articulated the test for voluntariness as whether the confession was "the product of an essentially free and unconstrained choice by its maker" or whether the defendant's will was "overborne" by coercive police conduct. *Culombe v. Connecticut*, 367 U.S. 568, 602, 81 S.Ct. 1860, 1879, 6 L.Ed.2d 1037, 1057 (1961). Under the federal test, even if there was a promise or inducement, there must be a causal connection between the promise or inducement and the statement. *Colorado v. Connelly*, 479 U.S. 157, 164, 107 S.Ct. 515, 520, 93 L.Ed.2d 473, 482 (1986). In *Winder v. State*, we articulated the proper voluntariness analysis as follows:

"[W]e generally look at the totality of the circumstances affecting the interrogation and confession. We look to all of the elements of the interrogation to determine whether a suspect's confession was given to the police through the exercise of free will or was coerced through the use of improper means. On the non-exhaustive list of factors we consider are the length of the interrogation, the manner in which it was conducted, the number of police officers present throughout the interrogation, and the age, education and experience of the suspect."

362 Md. at 307, 765 A.2d at 114 (citations omitted).

We hold that the trial court erred in ruling that appellee's second and third statements were involuntary. The statements satisfied Maryland's requirements for admission into evidence: the statements were voluntary under Maryland nonconstitutional law, voluntary under the Due Process Clause of the Fourteenth Amendment of the United States Constitution and Article 22 of the Maryland Declaration of Rights, and satisfied the mandates of *Miranda*. *See Hoey v. State*, 311 Md. 473, 480, 536 A.2d 622, 625 (1988). The Circuit Court's ruling was based essentially on the absence of *Miranda* warnings once custody attached. When that factor is eliminated from the analysis, there is no basis whatsoever for finding that appellee's statements were involuntary.

There is no evidence on this record to establish any threat, promise, or inducement made by law enforcement officers to appellee. Nor does the record reflect any basis for a finding that appellee's will was overborne. There is *no* evidence of coercive police tactics. The record indicates that Tolbert came to the police station voluntarily. He remained calm and quiet. He was nineteen years old and had earned a high school diploma. He suffered from no mental disability and presented no evidence that he did not understand what was happening or that he could not exercise free will. At the police station, he was permitted to talk with his mother as he smoked a cigarette at the back door and he was not restrained in any way at that time. There were two police officers in the room with appellee when he gave his third statement. The

officers spoke in conversational tones and never subjected him to long periods of interrogation. He never asked for a lawyer. In short, there is no evidence to show that appellee's will was overborne in any way.

Under the totality of the circumstances, the statements were voluntary and pass scrutiny under constitutional and Maryland nonconstitutional grounds to be admissible in evidence.

Chief Judge BELL joins in the judgment only.