GORDON LEE RICHARDSON *v.*
STATE OF MARYLAND

[No. 148, September Term, 1968.]

*Decided April 1, 1969.*

*James C. Chapin* for appellant.

*Henry J. Frankel, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Arthur A. Marshall, Jr., State's Attorney for Prince George's County,* and *Vincent J. Femia, Assistant State's Attorney for Prince George's County,* on the brief, for appellee.

MORTON, J., delivered the opinion of the Court.

The appellant, Gordon Lee Richardson, was convicted by a jury in the Circuit Court for Prince George's County of rape, committing a perverted sex act and burglary. He was sentenced by Judge Ralph W. Powers to serve twenty years on the rape conviction, five years on the perverted sex act conviction and twenty years on the burglary conviction, the latter two sentences to run concurrently with the sentence for rape.

The victim, who was twenty-four years of age, unmarried and living alone in an apartment dwelling, testified that shortly prior to 6:00 a.m. on December 16, 1967, she awakened to find a man in her room, whom she identified at the trial as the appellant. She immediately screamed. He then approached her, placed his hand over her mouth and "started pulling down my pajama bottoms, and I started fighting him and he hit me several times." He then got on the bed, placed his mouth "in my vagina" whereupon the victim hit the appellant on his head with a bowling tenpin which she had beside her bed. According to the victim, "I started screaming because I realized I didn't knock him out and I was scared." The appellant then "got up and went to the bathroom and got a towel and was washing his head with it because it was bleeding. And he came back and I was trying to talk him into leaving * * *." He then went to the front door "and I thought he was leaving, and then he said, 'Oh, no.' And then he came back." In response to the question what happened then, the victim replied: "He raped me." Thereafter the appel-

lant left the apartment and the victim ran to the next door apartment and reported what had occurred to her neighbor. The victim further testified, that entrance to her apartment was gained through a window, the front door being locked.

A police officer testified that earlier that morning, between 4:00 a.m. and 4:15 a.m., he observed the appellant "tiptoeing away from a lighted bathroom window" of a building in the vicinity of the apartment occupied by the victim; that he took him into custody and was driving him to the police station in a police car when he decided to release the appellant because he was not certain what charge to place against him.

A police Sergeant testified, out of the presence of the jury, that at 1:00 p.m. on December 16, 1967, he went to the appellant's home; advised him that he was under arrest for rape and burglary; placed handcuffs upon him; and escorted him to the police cruiser. There he read to the appellant from a card (which was introduced in evidence)[1] the so-called *Miranda* warnings. The Sergeant stated that after reading the "identification side" of the card to the appellant, he started reading the

---

1. The card evidently had been prepared by the State's Attorney for Prince George's County. The "identification side" contained the following:

"Identify yourself and advise:
1. You have a right to remain silent.
2. Anything you say can and will be used against you in a court of law.
3. You have the right to talk to a lawyer and to have him with you during questioning.
4. If you cannot afford a lawyer one will be appointed for you before a statement is taken if you wish.
5. If you decide to give a statement you still have the right to stop at any time so you may talk to a lawyer."
The "waiver side" contained the following:
"Waiver:
Do you understand your rights and what I have just explained to you?
Are you willing to make a statement without a lawyer present at this time?
Do you understand and know what you are doing?
Have any promises, threats or inducements been made to pressure or coerce you into making this statement?"

other side (waiver) and "as I came to the point, 'Do you understand and know what you are doing?' instead of answering in the affirmative or the negative he said, 'I did not rape that girl. She gave in to me voluntarily.' "

The Sergeant stated that about forty minutes later, after the appellant had been taken to the police station:

> "I again read the card to him. He repeated—I said, 'Do you understand your rights and what I have just explained to you?' And he said he did. I said, 'Are you willing to make a statement without a lawyer present at this time?' And he said, 'I do want to have an attorney appointed to me.' However — he didn't say however. He said, 'I do want an attorney, but my story will be the same. I did not rape the girl.' And then he reiterated what he told me previously."

As indicated above, the foregoing testimony was given out of the presence of the jury and the trial judge, after hearing extended argument, concluded that "there is no indication that the statement made was anything other than entirely voluntary."

In this appeal, the appellant first contends that it was error to admit the statement since "there was no showing by the State that prior to his making said statement he was advised that he was entitled to have an attorney appointed for him if he could not afford one." He apparently bases this argument on the fact that the *"Miranda* card" which was introduced into evidence, without objection, was not sent to this Court with the record of the proceedings below. However, the record has been properly corrected; the card is now a part of the record before us; and it is clear that the card, which was read to the appellant on two separate occasions, contained the warning: "If you cannot afford a lawyer one will be appointed for you before a statement is taken if you wish." It is apparent, therefore, that the complaint of the appellant in this respect is without substance.

It is next contended that the appellant's statement was erroneously admitted because "there was no showing by the State that prior to his making said statement he had waived his constitutional rights against self-incrimination and his right to re-

tained or appointed counsel." He points to the language of Chief Justice Warren in *Miranda v. Arizona,* 384 U. S. 436, to the effect that "a heavy burden rests on the government to demonstrate the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel." And he argues that under the mandate of *Miranda* the relinquishment of the privilege "cannot be presumed from the mere silence of the defendant after being warned of his rights."

This argument overlooks the fact, however, that the entire thrust of *Miranda* was directed toward custodial interrogations. It was stated: "We deal with the admissibility of statements obtained from an individual who is subjected to custodial police interrogation * * *. By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." It was further held that "volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today." In the case at bar, there can be no question that the appellant was in police custody at the time the statement was given; but it is equally clear that the statement was not the result of "questioning initiated by law enforcement officers * * *." On each occasion that the appellant gave the statement, it occurred at a time when the police officer was reading the warnings to him from the card. It is apparent that the appellant simply interrupted the officer and "blurted out" or "volunteered" the statement. The officer had not asked him any questions concerning the crimes for which he was arrested; interrogation, in the sense contemplated by *Miranda,* had not begun. Thus, we find that the argument advanced by the appellant concerning waiver of his privilege against self-incrimination is not well taken in view of the factual setting in which he gave the statement. See *Bazzell v. State,* 6 Md. App. 194; *King v. State,* 5 Md. App. 652; *Howell v. State,* 5 Md. App. 337; *Campbell v. State,* 4 Md. App. 448; *Carwell v. State,* 2 Md. App. 45, 50; *Gaudio and Bucci v. State,* 1 Md. App. 469. Cf. *Hale v. State,* 5 Md. App. 326 (where the so-called *Miranda* card was not offered in evidence).

Finally, the appellant contends that the lower court erred in not granting his motion for a judgment of acquittal on the charge of burglary because the State failed to prove that the alleged breaking and entering occurred in the nighttime. In the record before us, the appellant made a motion for a judgment of acquittal at the conclusion of the State's case which motion was denied by the trial judge. Although the appellant did not take the stand and no witnesses were called on his behalf, he did introduce into evidence as a part of his defense, after the motion had been denied, a photograph depicting his physical condition on the day of his arrest and he also introduced into evidence the hospital record showing the treatment he received on the day of the crime. By going forward with the evidence in this fashion, he thereby withdrew his previous motion for judgment of acquittal. See Md. Rule 755 b. The appellant failed to renew his motion at the end of the entire case and, because this was a jury case, his failure to make the motion precludes this Court from reviewing the sufficiency of the evidence. *Jason v. State*, 1 Md. App. 136.

*Judgments affirmed.*