984 A.2d 851

**Maurice Darryl PRIOLEAU**

v.

**STATE of Maryland.**

**No. 40, Sept. Term, 2008.**

Court of Appeals of Maryland.

Dec. 9, 2009.

**630**

David P. Kennedy, Asst. Public Defender (Nancy S. Forster, Public Defender), on brief, for Petitioner.

Cathleen C. Brockmeyer, Asst. Atty. Gen. (Douglas F. Gansler, Atty. Gen.), on brief, for Respondent.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, MURPHY, ELDRIDGE, JOHN C. (Retired, Specially Assigned), RAKER, IRMA S. (Retired, Specially Assigned), JJ.

MURPHY, J.

In the Circuit Court for Baltimore City, a jury convicted Maurice Darryl Prioleau, Petitioner, of conspiracy to distribute cocaine and several related violations of the Maryland Controlled Dangerous Substances Act. The State's evidence was sufficient to establish that he committed those offenses on March 28, 2005. Petitioner noted an appeal to the Court of Special Appeals, which affirmed the judgments in *Prioleau v. State,* 179 Md.App. 19, 943 A.2d 696 (2008). Petitioner then requested that this Court issue a *writ of certiorari* to address the following question:

> Was the question "What's up, Maurice?" the functional equivalent of interrogation under all the circumstances of this case, where the question was posed by a police officer standing in the doorway of a stash house the suspect had been seen using, and was directed toward a handcuffed suspect who had just been arrested by another officer nearby and brought back to the stash house?

That request was granted. 405 Md. 290, 950 A.2d 828 (2008). For the reasons that follow, we hold that the words at issue did not constitute the functional equivalent of custodial interrogation, and therefore affirm the judgment of the Court of Special Appeals.

## Background

Detective Timothy Stach was the only witness who testified at the suppression hearing.[1] The Court of Special Appeals provided the following summary of the Detective's testimony:

---

1. The pretrial motion for suppression, which was included in the "Omnibus Pre–Trial Defense Motions" filed on behalf of Petitioner and a co-defendant, asserted that "any statements or confessions taken from Defendant by police authorities were involuntary and elicited without

On March 28, 2005, Baltimore City Police Detective Timothy Stach and his partner Officer Jenkins were conducting a covert surveillance of the 1600 block of Regester Street. Det. Stach testified that, at about 6:00 p.m., he observed an Acura automobile pull to the curb. An individual, whom the detective recognized as Maurice Prioleau, [Petitioner], got out of the Acura and jogged to 1614 Regester Street.

Det. Stach watched as [Petitioner] took out a clear plastic bag and tossed it onto the front steps of the house at that address. Det. Stach was using 10 by 50 binoculars at the time and could see small vials inside the plastic bag. The detective opined at the hearing as an expert in the packaging, distribution, and identification of controlled dangerous substances that the bag contained cocaine.

Det. Stach saw [Petitioner] walk around the corner at the end of the block. The detective then saw a man, later identified as Keith Evans, walk up to the house at 1614 Regester Street to retrieve the bag. Det. Stach watched Evans distribute the contents of the bag to several individuals who had followed him. Those individuals walked away after the transactions. Evans continued to pace Regester Street, distributing items from the bag to individuals who approached him.

[Petitioner] appeared and walked with Evans south on Regester Street toward Federal Street. [Petitioner] turned onto Federal Street, while Evans continued to distribute the contents of the bag to additional individuals along Regester Street.

Det. Stach recalled that, at about 4:20 p.m., [Petitioner] returned. He entered 1610 Regester Street, and, after one minute, emerged with another bag of suspected cocaine. [Petitioner] gave the bag to Evans, who resumed his routine

---

observance of procedural safeguards required by law." Although that motion did "respectfully pray for ... [s]uppression of all statements and confessions taken from defendant by State agents[,]" it was not supported by a memorandum asserting that Petitioner had made an inculpatory statement after he had been subjected to the "functional equivalent" of interrogation.

of strolling back and forth on Regester Street, engaging in "hand-to-hand transactions" with individuals who approached.

Det. Stach alerted Officer David Crites, who was at the police station, that he believed he was witnessing "narcotics activity," and [Petitioner] and Evans were "working in tandem." Officer Crites responded to the scene, driving a marked police vehicle. Officer Crites saw Evans walking northbound toward the house at 1608 Regester Street and handing off the bag to an unknown person at that address. Officer Crites arrested Evans.

Det. Stach and Officer Jenkins emerged from their undercover observation position and joined Officer Crites. Det. Stach instructed Officer Crites to "go get [Petitioner]."

Det. Stach then escorted Evans into the house at 1610 Regester Street. The detective testified that there were numerous torn clear plastic bags on the floor, indicating drug activity in the house.

Meanwhile, Officer Crites located [Petitioner], arrested him, and placed him in the cruiser. Officer Crites then drove to the front of 1610 Regester Street and removed [Petitioner] from the vehicle. [Petitioner] was reluctant to move, so Officer Crites employed a "wrist lock" and walked [Petitioner] up to the entrance of the house.

As Officer Crites appeared at the front door of 1610 Regester Street with [Petitioner], Det. Stach was standing there. He said to [Petitioner]: "What's up, Maurice?" [Petitioner] then said: "I'm not going in that house. I've never been in that house." Det. Stach testified that his words to [Petitioner] were "not a question on anything that has to do with illegal activity." He stated, moreover, that [Petitioner] appeared very agitated and nervous when he "blurted out" those words. Det. Stach acknowledged that [Petitioner] was under arrest by the time he was brought to the house . . . .

Inside 1610 Regester Street, the police recovered a handgun with live rounds in it and three plastic bags containing

25 clear vials of cocaine, all of which had been stashed above the ceiling tiles. The police searched [Petitioner] incident to his arrest and recovered $210.00 [from Petitioner's person].

179 Md.App. at 22–24, 943 A.2d at 698–99 (footnotes omitted).

The record shows that the following transpired during Detective Stach's direct examination:

[STATE'S ATTORNEY:] And when you observed [Petitioner] being brought up to the house, could you explain his demeanor and his tone when he was making the statements to you?

[DETECTIVE STACH:] Oh, he was very agitated, nervous and he, again, he blurted out, as I said, "Hi, Maurice," to him, "I'm not going in that house. I was never in that house."

The following transpired during Detective Stach's cross-examination:

[PETITIONER'S COUNSEL:] And when [Petitioner] was brought back by Officer Crites, was he free to leave at that time?

[DETECTIVE STACH:] No, he was under arrest.

[PETITIONER'S COUNSEL:] He was under arrest at that time?

[DETECTIVE STACH:] Yes, at my direction.

[PETITIONER'S COUNSEL:] And did you read [Petitioner] his *Miranda* rights at that time?

[DETECTIVE STACH:] No, I did not.

[PETITIONER'S COUNSEL:] And are you aware of whether Officer Crites did?

[DETECTIVE STACH:] No, I do not believe so. I don't know. [Petitioner] was never questioned.

[PETITIONER'S COUNSEL:] Well, you asked him what was up, didn't you?

[DETECTIVE STACH:] That's not a question on anything that has to deal with illegal activity.

[PETITIONER'S COUNSEL:] I'm not asking you that[.]

[DETECTIVE STACH:] I did ask him what was up.

\* \* \*

[PETITIONER'S COUNSEL:] And after [Petitioner] blurted out [that] he didn't want to go into the house, I assume that's when the arrest and control technique was used; is that correct?

[DETECTIVE STACH:] He was escorted in. I asked [Officer Crites] to bring him in. We needed him in the house. I didn't want one officer outside, one officer inside and then me looking around the house with three suspects, three Defendants [in there with me].

[PETITIONER'S COUNSEL:] Detective, I asked you[,] was that before or after he blurted it, the statement out.

[DETECTIVE STACH:] He was put into the house after he blurted out the statement, he was brought into the house.

[PETITIONER'S COUNSEL:] And it's my understanding from your testimony that nobody asked [Petitioner] any questions except you?

[DETECTIVE STACH:] I said, "What's up, Maurice?" That's a question, yes, ma'am.

[PETITIONER'S COUNSEL:] And that's when he blurted the statement out?

[DETECTIVE STACH:] That's when he stated, "I'm not going in that house. I haven't been in that house." Yes, ma'am.

[PETITIONER'S COUNSEL:] And after that, were there any other questions that were asked of him?

[DETECTIVE STACH:] Not by me.

The following transpired at the conclusion of Detective Stach's testimony:

[PETITIONER'S COUNSEL:] Your Honor, I'm just going to submit. Thank you very much.

THE COURT: Okay.

[STATE'S ATTORNEY:] Your Honor, I just simply argue that the statement that was made wasn't really . . . in response to an interrogation, therefore *Miranda* didn't really apply at that time. It was a statement that was blurted out and I don't think it should be suppressed. And as far as the money that was recovered off of [Petitioner], it was [a] search incident to arrest and there was probable cause based on the facts that Your Honor heard.

THE COURT: Okay, based on the evidence before the Court, the Court is satisfied that there was compliance with the Constitution of Maryland. Also, the Court is further satisfied that the law of the State is that an interrogation is where the officer expressly ask[s] an individual a question or employ[s] any word or act that the officer should [have] know[n][was] reasonably likely to elicit an incriminating response. The evidence before the Court establishes that the comments by Detective[ ] Stach amounted to merely an exchange of greetings [under] the case law [of] [*Rhode Island v.*] *Innis,* 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 [(1980)], [and] . . . [*State v.*] *Conover,* 312 Md. 33 [537 A.2d 1167 (1988)]. Also, the law of the State is [that] volunteer[ed] statements or blurts that are not the product of an interrogation, [do] not trigger *Miranda* warnings. The Motion to Suppress . . . the statements [is] considered and denied.

The State's case-in-chief included the testimony that Petitioner sought to suppress.

### Standard of Review

 The following standard of review is applicable to a case in which a petitioner argues that this Court should reverse the denial of a motion to suppress his or her inculpatory statement:

> In reviewing a circuit court's grant or denial of a motion to suppress evidence, we ordinarily consider only the evidence contained in the record of the suppression hearing. *State v. Tolbert*, 381 Md. 539, 548, 850 A.2d 1192, 1197 (2004); *State v. Rucker*, 374 Md. 199, 207, 821 A.2d 439, 443–44 (2003); *White v. State*, 374 Md. 232, 249, 821 A.2d 459, 469 (2003). The factual findings of the suppression court and its conclusions regarding the credibility of testimony are accepted unless clearly erroneous. *Tolbert*, 381 Md. at 548, 850 A.2d at 1197. We review the evidence and the inferences that may be reasonably drawn in the light most favorable to the prevailing party. *Id.; Rucker*, 374 Md. at 207, 821 A.2d at 444; *White*, 374 Md. at 249, 821 A.2d at 469. We "undertake our own independent constitutional appraisal of the record by reviewing the law and applying it to the facts of the present case." *Tolbert*, 381 Md. at 548, 850 A.2d at 1197; *White*, 374 Md. at 249, 821 A.2d at 469.

*Rush v. State*, 403 Md. 68, 82–83, 939 A.2d 689, 697 (2008).

### Discussion

 In the case at bar, it is clear that (1) Petitioner was "in custody" when he made the inculpatory statement,[2] and (2) none of the exceptions to the requirements of *Miranda v.*

---

2. "[P]ersons temporarily detained pursuant to [*Terry* stops and ordinary traffic] stops are not 'in custody' for the purposes of *Miranda.*" *Berkemer v. McCarty*, 468 U.S. 420, 440, 104 S.Ct. 3138, 3150, 82 L.Ed.2d 317 (1984). A "custodial" arrest occurs when "a known or suspected offender" is detained and taken into custody "for the purpose of prosecuting him [or her] for a crime." *Cornish v. State*, 215 Md. 64, 67–68, 137 A.2d 170, 172 (1957). Petitioner's "custodial arrest" occurred before he made the incriminating response.

*Arizona* are applicable.[3] Petitioner was therefore entitled to suppression of the statement at issue if that statement resulted from either *actual* interrogation or the *functional equivalent* of interrogation. We hold, however, that Petitioner was subjected to neither.

As to whether "What's up, Maurice?" constituted actual interrogation,[4] it is very well settled that not every question constitutes "interrogation" of a suspect who is in custody when the question is asked. As the Supreme Court of Indiana has stated:

The term "interrogation" has been defined as a process of questioning by law enforcement officials which lends itself to obtaining incriminating statements. *Escobedo v. Illinois,* (1964), 378 U.S. 478, 485, 84 S.Ct. 1758, 1762, 12 L.Ed.2d 977, 986. Not every statement uttered by a police officer which is punctuated with a question mark will necessarily constitute an interrogation.... Rather, it is necessary to view the statement in the context in which it was made.

*Johnson v. State,* 269 Ind. 370, 380 N.E.2d 1236, 1240 (1978).

While the *Miranda* warnings must precede questions directed to the issue of whether a suspect who is in custody has engaged in and/or has knowledge of criminal activity, a classic example of a question that does not constitute "interrogation contemplated by *Miranda*" is a question that asks the defendant, "Do you understand your (*Miranda*)

---

**3.** The exceptions to the *Miranda* requirements include the "routine booking question" exception discussed in *Hughes v. State,* 346 Md. 80, 87, 695 A.2d 132, 136 (1997); the "public safety" exception recognized in *New York v. Quarles,* 467 U.S. 649, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984); and the "rescue doctrine" exception discussed in *Thomas v. State,* 128 Md.App. 274, 737 A.2d 622 (1999), *cert. denied,* 357 Md. 192, 742 A.2d 521 (1999).

**4.** Although Petitioner has never expressly conceded that his statement was not the product of actual or "express" interrogation, he has asked this Court to determine only the issue of whether (in the words of his Petition) "the question 'What's up, Maurice?' [was] the **functional equivalent of interrogation** under all the circumstances of this case ... ?" (Emphasis supplied).

rights?" *Richardson v. State,* 6 Md.App. 448, 452, 251 A.2d 924, 927 (1969), *cert. denied* 255 Md. 743 (1969).

In *Richardson,* an appellant who had been convicted of rape and related offenses argued that he was entitled to a new trial on the ground that the State's evidence included statements attributed to him while he was being asked questions to determine whether he understood his *Miranda* rights. After the appellant had been placed under arrest, he was advised of his rights by a detective who read from a *"Miranda* card" that was introduced into evidence.[5] That card contained four questions to be asked of the defendant after he or she had received the advise required by *Miranda:*

Do you understand your rights and what I have just explained to you?

Are you willing to make a statement without a lawyer present at this time?

Do you understand and know what you are doing?

Have any promises, threats or inducements been made to pressure or coerce you into making this statement?

*Id.* at 450 n. 1, 251 A.2d at 926 n. 1. The suppression hearing court accepted the following testimony of the arresting officer. After he had read to appellant the *Miranda* rights contained on the card, and while he was asking appellant the questions contained on the card, appellant stated, "I did not rape that girl. She gave in to me voluntarily." While rejecting the appellant's contention that his statement should have been suppressed, the Court of Special Appeals stated:

In the case at bar, there can be no question that the appellant was in police custody at the time the statement was given; but it is equally clear that the statement was not the result of "questioning initiated by law enforcement officers [quoting *Miranda v. Arizona,* 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966)]." . . . It is apparent that the appellant simply interrupted the officer and "blurt-

---

**5.** The *Richardson* opinion includes the entire contents of the *Miranda* card. 6 Md.App. at 450 n. 1, 251 A.2d at 926 n. 1.

ed out" or "volunteered" the statement. The officer had not asked him any questions concerning the crimes for which he was arrested; interrogation, in the sense contemplated by *Miranda*, had not begun.

*Id.* at 452, 251 A.2d at 926 –27.

Cases holding that not every question constitutes "interrogation" include *United States v. Jackson*, 189 F.3d 502 (7th Cir.1999), in which an appellant who had been convicted of possession of crack cocaine with intent to distribute argued that he was entitled to a new trial on the ground that the government's evidence included his post-arrest statements made after he had been asked whether he "would like to assist in different avenues of investigation that [you] could help us on[?]" *Id.* at 506. On June 16, 1997, the appellant was arrested for driving without a valid license, crack cocaine was discovered in the trunk of the vehicle he had been driving, and a vial containing crack cocaine was found under the seat of the patrol car in which he had been placed before being transported to police headquarters. On June 17, 1997, the appellant (1) was removed from his cell by a detective of the East St. Louis Police Department (the detective) and advised of his *Miranda* rights, (2) stated that he would not make a statement unless a lawyer was present, and (3) was returned to his cell. On June 18, 1997, upon learning that the appellant had been arrested, an agent of the Illinois State Police (the agent) requested that the detective bring the appellant to an interview room where the agent requested that the appellant assist the officers in their investigation of the appellant's supplier. The statements at issue were made as the appellant was being returned to his cell. The United States District Court for the Southern District of Illinois ruled that the appellant was not entitled to suppression of those statements. While affirming that ruling, the United States Court of Appeals for the Seventh Circuit provided the following factual background:

> During the interview, . . . [the agent] explained to Jackson that he was not concerned with any of the details of Jackson's arrest of June 16, 1997. [The agent] also advised Jackson that . . . he [(the agent)] had knowledge that [the

appellant] had sold crack cocaine on two separate occasions to an undercover officer. [The agent] also told [the appellant] that he was not interested in obtaining any statement from him and that he was a "little fish" who could help the police catch his supplier.... [The appellant] stated that he would call [the agent] upon his release. [The agent's] conversation with [the appellant] lasted approximately twenty minutes.... As [the detective] escorted [the appellant] back to his cell, [the appellant] mentioned to [the detective] that after speaking to [the agent] he realized "that he was in a lot of trouble. He stated that he wanted to clear up an earlier matter of the traffic stop in the park." ...

During the ensuing conversation, [the appellant] volunteered information to [the detective] concerning the June 16 traffic stop, none of which related to [the agent's] narcotics distribution investigation. Jackson stated that the bag of crack found in the trunk of [the] car [he had been driving immediately prior to his arrest] was his and took responsibility for placing the cocaine vial beneath the seat of the squad car.

*Id.* at 505–06 (footnote omitted). After citing *Arizona v. Roberson,* 486 U.S. 675, 678, 108 S.Ct. 2093, 2096, 100 L.Ed.2d 704 (1988), (in which the United States Supreme Court held that, even if a suspect invokes his or her right to counsel when interrogated with respect to a particular investigation, the investigating officers "are free to inform the suspect of the facts of the second investigation as long as such communication does not constitute interrogation"), the *Jackson* Court stated:

When [the agent] explained to Jackson that ... he knew that [the appellant] had sold crack cocaine to the undercover office on two occasions in April, he was "informing the suspect of the facts of the second investigation," *Roberson,* 486 U.S. at 687, 108 S.Ct. at 2101, and soliciting Jackson's assistance if he was willing to give it after he was released from jail. [The agent] also told [the appellant] that he had no interest in obtaining a statement from him. With respect to the constitutional claim that Jackson has raised concerning his interview with [the agent], in view of the fact

that [the agent] did not ask any questions of Jackson concerning the traffic stop on June 16, 1997, and since [the agent] advised Jackson of the fact that the only reason he was speaking with him was to solicit his help in an ongoing drug investigation after he was freed from jail, [the agent's] meeting with Jackson should not be considered an interrogation.

\* \* \*

"An accused, . . . having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, *unless the accused himself initiates further communication, exchanges, or conversations with the police.*" *Edwards v. Arizona,* 451 U.S. 477, 484–85, 101 S.Ct. 1880, 1885, 68 L.Ed.2d 378 (1981) (emphasis added). After speaking with [the agent] on June 18, 1997, and as [the detective] was returning [the appellant] to his cell, Jackson personally requested that he be allowed to speak with the police in order that he might "clear up" the traffic stop. Obviously, . . . it was Jackson who "initiated further communication." *Id.*

*Id.* at 511. (Emphasis in opinion).

The above cited cases are consistent with *Hughes v. State,* 346 Md. 80, 695 A.2d 132 (1997), in which, while holding that the "routine booking question" exception (to the requirements of *Miranda v. Arizona* ) does not encompass a question as to whether the arrestee is a "narcotics or drug user," this Court stated that "the critical inquiry is whether the police officer, based on the totality of the circumstances, knew or should have known that the question was reasonably likely to elicit an incriminating response." *Id.* at 95–96, 695 A.2d at 139–40. For these reasons, we conclude that, even if "What's up, Maurice?" was a question rather than a greeting, this "question" did not constitute "interrogation" contemplated by *Miranda.*

While concluding that the words spoken by Detective Stach were words of greeting rather than words of interrogation, the Court of Special Appeals stated:

The motions court concluded that Det. Stach's words, under the circumstances, were merely a greeting. Upon our independent assessment of the record, we agree. The phrase "what's up?" is commonly used as a greeting, especially, as the State points out, among young people. At least one other jurisdiction has recognized that the phrase is generally understood as a greeting. *See Arnett v. State*, 353 Ark. 165, 122 S.W.3d 484, 488 (Ark.2003) (stating that the phrase "What's up?" constitutes a general term of salutation, and holding that the officer's use of the phrase, under the circumstances of that case, was not interrogation or its functional equivalent); *United States v. Paredes*, 388 F.Supp.2d, 1185, 1193–94 (D.Haw.2005) (holding statement admissible where there was no evidence that a simple "Okay, what's up?" by the police officer would elicit an incriminating response).

Det. Stach's testimony indicates that he did not intend the words he spoke to appellant to be anything other than a greeting. He testified that "W hat's up, Maurice?" was "not a question on anything that has to do with illegal activity." The court did not indicate that it disbelieved that testimony, and we accept it. That fact is significant because "the police surely cannot be held accountable for the unforeseeable results of their words or actions," and "the definition of interrogation can extend only to words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response." *Innis*, 446 U.S. at 301–02, 100 S.Ct. 1682 (footnote omitted).

\* \* \*

Given that the phrase "what's up" is generally understood to be a greeting, and that Det. Stach did not intend the phrase to relate to anything "illegal," we conclude that the detective's utterance of the words "what's up, Maurice" was not the functional equivalent of interrogation, under the circumstances of this case. Consequently, appellant's statement that followed on the heels of Det. Stach's greeting was not the product of interrogation but rather was volunteered

by appellant. It was a classic "blurt," to which the protections of *Miranda* do not apply. *See Fenner* [*v. State* ], 381 Md. [1,] at 10[, 846 A.2d 1020, 1025 (2004), (holding that the petitioner had not been subjected to custodial interrogation during a bail review hearing when the presiding judge asked him, "Is there anything you would like to tell me about yourself?")]; *State v. Conover*, 312 Md. [33,] at 45[, 537 A.2d 1167, 1172 (1988)]; *see also Conboy v. State*, 155 Md.App. 353, 373, 843 A.2d 216[, 228] (2004) (holding that a police officer's comment, remarking that a key discovered in defendant's pocket fit the ignition of a car involved in an accident, "was merely an observation made without inviting a response;" and, although the appellant "nonetheless did respond," the response was not the product of interrogation and was properly admitted into evidence at trial).

179 Md.App. at 28–30, 943 A.2d at 702–03 (footnote omitted).

In *Arnett v. State*, 353 Ark. 165, 122 S.W.3d 484 (2003), the Supreme Court of Arkansas affirmed a sexual child abuse conviction obtained in part on evidence that, while the arresting officer was placing handcuffs on the defendant, (1) the arresting officer asked, "what's up?" and (2) the defendant stated that he had sexually abused his daughter and that he needed help. While rejecting the contention that the defendant's response should have been suppressed, the *Arnett* Court stated:

> We hold that [the officer's] general question in this case of "What's up?" is a general term of salutation much like the officer's salutation in *Weber v. State*, 326 Ark. 564, 933 S.W.2d 370 (1996), wherein we held that the trial court was correct in admitting a defendant's incriminating statement made in reply to the responding officer's salutation. It is not reasonable to view [the officer's] general "What's up?" as designed to elicit an incriminating response.

*Id.* at 488. The Court of Special Appeals expressly agreed with that analysis.[6] So do we. We therefore hold that

6. In *The Merriam–Webster Dictionary* (2005), "salutation" is defined as "an expression of greeting, goodwill or courtesy [usually] by word or gesture."

Petitioner's statement did not result from actual or express custodial interrogation.

As to the issue of whether Petitioner was entitled to suppression on the ground that his statement resulted from the functional equivalent of interrogation, it is well settled that the functional equivalent of interrogation can occur even if the defendant is not asked a single question. In *Rhode Island v. Innis,* 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980), while holding that the incriminating statement made by a robbery suspect being transported to the police station was admissible even though the statement was made in response to a conversation between the officers who were transporting the suspect, the United States Supreme Court stated:

> "[T]he *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. That is to say, the term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police. This focus reflects the fact that the *Miranda* safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices, without regard to objective proof of the underlying intent of the police. A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation. But, since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of the police officers that they *should have known* were reasonably likely to elicit an incriminating response."

*Id.* at 300–302, 100 S.Ct. at 1689–90 (footnotes omitted).

In *Drury v. State,* 368 Md. 331, 793 A.2d 567 (2002), while concluding that a petitioner had been subjected to the func-

tional equivalent of custodial interrogation, even though he had not been asked a single question before he made an inculpatory statement, this Court stated:

> It is a basic principle that a statement taken during custodial interrogation conducted before a defendant is informed of his or her *Miranda* rights may not be used by the State in its case in chief against the defendant. The test to be applied in determining whether the police officer's statements ... was tantamount to interrogation is whether the words and actions of the officer were reasonably likely to elicit incriminating responses from petitioner. *See Williams v. State,* 342 Md. 724, 760, 679 A.2d 1106, 1124–25 (1996).

*Id.* at 335–36, 793 A.2d at 510. In *Drury,* a jury convicted the petitioner of second degree burglary and related offenses. The State's case included evidence that the petitioner made an inculpatory statement after he had been (1) "picked up for questioning," (2) placed in an interrogation room, (3) shown a tire iron recovered at the scene of the crime, (4) shown a trash bag containing magazines that had been stolen during the burglary, and (5) told that those items would be examined for fingerprints. Even though the petitioner had not been asked any questions before he made the inculpatory statement, because that statement was made before he was advised of his *Miranda* rights, this Court held that the statement should have been suppressed on the ground that "the officer's conduct and words were the functional equivalent of interrogation within the meaning of *Innis,*" explaining:

> It is undisputed that, although petitioner was in custody, he was not subjected to express interrogation. The officer did not ask petitioner questions, but rather made a statement to him and displayed the tire iron and magazines.
>
> Petitioner had been brought to the police station for the express purpose of questioning and, in fact, had been told so by Corporal Whaley. The police were not engaged in routine booking procedures; they were not required by any Maryland rule or procedure to read any document (other than the *Miranda* rights) to petitioner. Nonetheless, the

officer placed the tire iron and the trash bag containing the stolen magazines on the table before petitioner before advising him of his *Miranda* rights. The officer told petitioner that he was going to send the evidence to be examined for fingerprints. Moreover, the officer testified that he "was presenting the evidence that was going to be used for questioning."

It appears to us that the only reasonable conclusion that can be drawn from the foregoing facts is that the officer should have known, in light of his having told petitioner that he was being brought in for questioning, that putting the evidence before petitioner and telling him that the items were going to be fingerprinted was reasonably likely to evoke an incriminating response from him. The only plausible explanation for the officer's conduct is that he expected to elicit a statement from petitioner.

*Id.* at 337, 793 A.2d at 571.

On the other hand, in *State v. Conover,* 312 Md. 33, 537 A.2d 1167 (1988), this Court reversed a holding of the Court of Special Appeals "that delivery of the Statement of Charges and Application to the respondent after he had requested an attorney constituted a form of interrogation." *Id.* at 38, 537 A.2d at 1169. In that case, a jury convicted the respondent of murder and related offenses. The State's case included evidence that he made an inculpatory statement after he had been advised of his *Miranda* rights and invoked his right to counsel. The respondent was arrested on a warrant, transported to the Baltimore County Police Headquarters, and taken to the office of the captain of the homicide squad, where he was read his *Miranda* rights and invoked his right to an attorney. Although he was not asked any questions at that time, while the detectives were completing his "processing," a detective (1) read the Statement of Charges to him, (2) handed him copies of that document as well as the Application for Statement of Charges, and (3) suggested that he "read them, look at them, [and] if [he] had any questions[,] ask them." *Id.* at 37, 537 A.2d at 1169. The respondent then asked several

hypothetical questions, and made the incriminating statement at issue.

While holding that the respondent's incriminating statement was admissible, this Court stated:

> [W]e are persuaded, as was the trial judge, that the police did not "interrogate" Respondent within the meaning of *Miranda.* They intended to question him, and took him to the captain's office for that purpose—an entirely proper procedure. However, when Respondent declined to waive his right to counsel, all questioning ceased. The officers were entitled to complete the processing of the arrestee, and were required to furnish him with a copy of the Charging Document. . . .

> We infer no sinister motive from the fact that police provided Respondent with a copy of the Application as well as a copy of the Statement of Charges. . . . We do not consider it unusual for the detectives to have treated the Application for a Statement of Charges as a part of the "packet" of charging documents.

> . . . The police acted reasonably and lawfully, and the Respondent was not subjected to compelling influences, psychological ploys, or direct questioning. His volunteered statement was properly admitted.

*Id.* at 42–45, 537 A.2d at 1171–72.

In *Blake v. State,* 381 Md. 218, 849 A.2d 410 (2004), this Court cited *Conover* for the proposition that "[m]erely presenting an accused with a charging document, without more is not the functional equivalent of interrogation." *Id.* at 236, 847 A.2d at 420. In *Blake,* however, while holding that all statements made by the petitioner after he invoked his *Miranda* rights were inadmissible, this Court stated:

> When the charging document was given to petitioner, containing a false statement of the law with respect to the penalty of death, it was accompanied by an officer's statement which served no legitimate purpose other than to encourage petitioner to speak.

\* \* \*

... We reject the State's characterization ... that the officer's statement ["I bet you want to talk now, huh!"] was merely a rhetorical question. The officer's statement to petitioner could only be interpreted as designed to induce petitioner to talk and it was improper.

*Id.* at 235–36, 849 A.2d at 420.

In the case at bar, Petitioner presented no evidence in support of his argument that his inculpatory statement resulted from the functional equivalent of custodial interrogation. He was entitled to testify at the suppression hearing without running the risk that the State could use his testimony in its case-in-chief,[7] because a defendant's suppression hearing testimony "may not thereafter be admitted against [the defendant] at trial on the issue of guilt unless [the defendant] makes no objection." *Simmons v. United States,* 390 U.S. 377, 394, 88 S.Ct. 967, 976, 19 L.Ed.2d 1247 (1968). As was the situation in *Conover,* however, only one witness testified at the suppression hearing. Under these circumstances, the suppression hearing court was not required to speculate that, when Petitioner heard the words, "What's up," he actually believed that he was being subjected to custodial interrogation.[8]

---

**7.** In *United States v. Salvucci,* 448 U.S. 83, 100 S.Ct. 2547, 65 L.Ed.2d 619 (1980), the United States Supreme Court noted that it "has not decided whether *Simmons* precludes the use of a defendant's testimony at a suppression hearing to impeach his testimony at trial." *Id.* at 93, 100 S.Ct. at 2554. The *Salvucci* Court also noted that *Gray v. State,* 43 Md.App. 238, 403 A.2d 853 (1979) is one of several cases holding "that such testimony is admissible as evidence of impeachment." *Id.* at 94 n. 8, 100 S.Ct. at 2554 n. 8.

**8.** In *Conover,* after noting that the respondent's trial counsel "did not argue that the delivery of a copy of the application constituted interrogation," but rather that "[t]here came a point in time at which Christopher Conover was asked whether or not he might be able to provide some information[,]" this Court stated:

Respondent did not testify at the suppression hearing, and no direct evidence was offered in support of [the] argument [presented during the suppression hearing]. The trial judge was under no obligation to accept the inference for which Respondent's [trial] counsel argued, and we accept the finding of the trial judge on that fact.

312 Md. at 44, 537 A.2d at 1172.

Reviewing the evidence in the light most favorable to the prevailing party, it is clear that the suppression hearing court found that Detective Stach did not intend to ask Petitioner "a question on anything that has to do with illegal activity." That factual finding was not clearly erroneous. The critical inquiry, therefore, is whether Detective Stach, based on the totality of the circumstances, knew or should have known that greeting Petitioner with the words, "What's up, Maurice?," would be reasonably likely to elicit an incriminating response. From our own independent constitutional appraisal of the record, we hold that it is not reasonable to expect that those words would be likely to elicit an incriminating response. We therefore agree with the suppression hearing court and the Court of Special Appeals that there is no merit in Petitioner's argument that he was subjected to the functional equivalent of interrogation.

**JUDGMENTS AFFIRMED; PETITIONER TO PAY THE COSTS.**