REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 2262

September Term, 2012

_____

LUIS A. MORALES

v.

STATE OF MARYLAND

_____

Krauser, C.J.,
Zarnoch,
Raker, Irma S.
　　(Retired, specially assigned),

JJ.

_____

Opinion by Raker, J.

_____

Filed: August 29, 2014

Luis Morales, appellant, was convicted in the Circuit Court for Prince George's County of robbery with a deadly weapon and related charges. Before this Court he presents the following questions for our review, which we have rephrased slightly:

1. Did the trial court admit prejudicial hearsay improperly?

2. Did the motions court err in denying appellant's motion to suppress pre-trial photographic identifications?

We shall answer both questions in the negative and affirm.

I.

Appellant was indicted by the Grand Jury for Prince George's County with the offenses of robbery with a deadly weapon, robbery, attempted robbery with a deadly weapon, attempted robbery, two counts of first degree assault, two counts of second degree assault, theft under $1,000, use of a handgun in the commission of a crime of violence, possession of a regulated firearm after a disqualifying crime and carrying a handgun. The jury convicted appellant of all the charges and the court sentenced him to the following terms of incarceration: twenty years, with all but ten years suspended for robbery with a deadly weapon; twenty years, to run consecutively, with all but five years suspended for use of a handgun in the commission of a crime of violence; and five years, to run concurrently, for possession of a regulated firearm.[1]

_____

[1]The court merged the remaining charges for sentencing purposes.

On February 22, 2013, Sahid Kaleem and his son, Taha Kaleem, arranged to meet appellant at 14701 Bowie Road in Laurel to purchase two cellular phones for $550. Appellant had advertised the phones for sale on the Internet website, Craigslist, which the Kaleems used to set up the transaction. Javeria Kaleem, Sahid's daughter and Taha's sister, accompanied her father and brother. When they arrived at the location, Sahid and Taha exited their vehicle to meet appellant, and Javeria stayed in the car. Appellant walked with the Kaleems over to their vehicle, pulled out a handgun and informed them that they were being robbed. Appellant first demanded money from Taha and shot him when Taha failed to comply. Appellant pointed the handgun at Sahid and made the same demand. Sahid complied, and appellant ran away. Taha called 911.

In the course of the investigation of the crime, the Kaleems made photographic identifications of appellant as the assailant. Appellant moved pre-trial to suppress the identifications. He argued that the police employed impermissibly suggestive procedures in obtaining the identifications and that the reliability of the identifications did not outweigh the corrupting effect of the suggestive procedures. The following facts were adduced at the suppression hearing.

Prince George's County Police Detective Andrew Batavick was the lead investigator of the robbery. On the night of the incident, the Kaleems went to the police station and met with Detective Batavick to make a statement and to look through a photo book that contained pictures of potential suspects. The detective put Taha and Javeria in one room, and he placed

2

Sahid in a different room. Detective Batavick gave the photo book to Javeria and instructed her and Taha to look through the photos individually, not to communicate with one another and to just go through the pictures to see if anyone looked similar to the person who robbed them.

Detective Batavick sat outside of the room while Taha and Javeria reviewed independently the pictures in the photo book. The detective left the door ajar. He monitored the children and stated that he did not see or hear the children communicating. Once they were finished, Taha and Javeria had selected two photographs, one of which was appellant, and they indicated that the two people in the photographs had similar features to the assailant. Neither Taha nor Javeria asserted that either of the two individuals was the robber. Sahid reviewed the pictures and indicated that, although some pictures looked similar, he could not identify the robber.

The following day, Detective Batavick and two other detectives went to the Kaleem's home to show them a photo array. Taha and Javeria were home, but Sahid was at work. Detective Batavick showed Taha and Javeria a photo array containing the pictures of six individuals, including appellant.[2] The photo of appellant was a more recent photo of him

[2]Detective Batavick stated that further investigation led the police to believe that appellant was their primary suspect. Accordingly, the detective obtained a photograph of appellant, different from the one used in the photo book, and he utilized the Maryland Image Repository to generate the photo array. He indicated that the process involves using digital imagery to formulate individuals matching the same facial features as appellant based on the new photograph that he obtained.

3

than the one in the photo book that the Kaleems saw on the previous night. The photo array did not include a photo of the other individual that Taha and Javeria had selected from the photo book. After reviewing independently the photo array, Taha and Javeria each identified appellant as the assailant.[3]

On February 28, 2013, the detectives met with Sahid to show him the same photo array that was presented to the children. Sahid identified appellant as the person who robbed him and stated, "that's him."

The Kaleems testified at the suppression hearing about their identifications. Javeria claimed that she communicated openly with her brother while reviewing the photo book at the police station on the night of the incident. She indicated that because she did not get a good look at the assailant's face, she relied on her brother's input. In doing so, however, Javeria claimed that Taha did not tell her which picture to select. Javeria also testified that she told her father which picture she thought looked like the assailant. On cross-examination, Javeria stated that the police did not tell her which picture to select nor did they influence her in any way. Taha denied communicating with his sister. He testified that Javeria did not confide in him to make her identification and that the police gave them instructions to not communicate with one another.

After hearing testimony, the court ruled as follows:

---

[3]Taha stated that the person in the photo that he selected had a similar nose, mouth, color of skin and hairstyle as the assailant. Javeria selected appellant's photo and noted, "that's him."

4

"[I]t is apparent to the Court that, of course, their testimonies are not, of the two children, are not consistent, but that is more fodder for trial than motions. What we're looking at here is the conduct of the State agents, the police. And in this case, both children were very clear on the fact that the police didn't tell them which picture to pick, they didn't suggest to pick any particular picture, and the Court found their testimony as to that, which is really the issue in this case, the conduct by the police, credible.

And, so, the Court finds that the Defense has not met its burden in this case to get to the second prong in that the Court does not find that there was any - - the Court does not find, based upon the evidence, that there was any suggestivity on the part of the police in any of the witnesses' identifications to cause this Court to suppress those pretrial identifications. So, I'm going to deny the Defense Motion to Suppress."

The court denied appellant's motion to suppress the photo identifications and the case proceeded to trial.

At trial, Detective Batavick testified about the details of the investigation that led to appellant's arrest. At one point, the State sought to elicit testimony from the detective explaining how he arrived at appellant's home. The colloquy occurred as follows:

"[PROSECUTOR]: So let's take a step back. You went to the Kaleem house - - residence the 23rd of February, correct?

DET. BATAVICK: Yes.

[PROSECUTOR]: What, if anything, else -- did you do further investigation at that time?

DET. BATAVICK: Once I was finished there we contacted Craigslist.

[DEFENSE COUNSEL]: Objection.

5

THE COURT: He can testify he contacted Craigslist. Overruled.

[PROSECUTOR]: And based on the, don't tell us what you received, but based on what information you got, what, if anything, did you do?

DET. BATAVICK: Rephrase the question.

[PROSECUTOR]: What did you do with the information you received - - did you get information from Craigslist?

DET. BATAVICK: Yes.

[PROSECUTOR]: What did you do with the information you received from Craigslist, what investigative action did you take?

[DEFENSE COUNSEL]: I object.

THE COURT: And that's overruled.

DET. BATAVICK: With the information received from Craigslist, I contacted the cell phone carrier. They provided a number that carried a list.

[DEFENSE COUNSEL]: Objection.

THE COURT: You can say you contacted the cell phone carrier. Next question. Yes, he can.

[PROSECUTOR]: Did there come a time when you went to 13503 Briarwood Drive?

DET. BATAVICK: Yes.

[PROSECUTOR]: And why did you go to that particular address?

6

DET. BATAVICK: The carrier provided us with a name and address to that number.

[DEFENSE COUNSEL]: Objection.

THE COURT: Based on the information received from the carrier?

DET. BATAVICK: Yes.

THE COURT: That's stricken as the way he put it, so sustained. What I'm trying to say to you is, it's called hearsay what some other entity said or did - - you cannot do that, only what you said or did, okay.

[PROSECUTOR]: Did you go that address?

DET. BATAVICK: Yes."

Defense counsel did not move for a mistrial and the examination continued.

At the close of all the evidence, the court instructed the jury, in relevant part, as follows:

"The following things are not evidence and you should not give them any weight or consideration: Any testimony that I struck or did not admit into evidence and the questions that the witnesses were not permitted to answer and objections of the lawyers . . . .

When I did not permit the witness to answer a question, you must not speculate as to the possible answer. If, after an answer was given, I order that the answer be stricken, you must disregard both the question and the answer."

As indicated above, appellant was convicted of all the charges and sentenced. This timely appeal followed.

7

II.

Appellant argues first that the court erred by admitting prejudicial hearsay testimony. He contends that Detective Batavick should not have been permitted to testify that he contacted Craigslist and received a phone number, which in turn led him to contact a cell phone carrier that provided appellant's contact information. He argues that the detective could have explained that he went to appellant's address "upon information received" instead of relaying specific information that connected him to the robbery. Next, appellant argues that the court erred in denying his motion to suppress because the police employed impermissibly suggestive procedures to obtain the Kaleem's photographic identifications. He argues that because the police allowed Taha and Javeria to sit in the same room and discuss the descriptions with one another, it tainted the identification procedure. Moreover, appellant asserts that it was impermissibly suggestive that the police included his photograph in both the photo book and the photo array without including the picture of another suspect identified by Taha and Javeria. He concludes that the State failed to establish by clear and convincing evidence that the identifications were reliable nonetheless.

The State counters first that the court did not admit prejudicial hearsay testimony because it responded properly to the objection and struck the objectionable testimony. The State notes that appellant did not move for a mistrial and hence, the court afforded him all the remedy for which he sought. Next, the State maintains that the identification procedures employed by law enforcement were not impermissibly suggestive. The State argues that

8

Detective Batavick instructed the witnesses to not communicate with each other and that he did not see or hear the children violate that instruction. In addition, the State notes that there is nothing to suggest that the witnesses noticed that appellant's photo was included in both the photo book and the photo array and that the photo of the other individual they selected previously was absent. The State concludes that the inquiry into the reliability of the identifications ended when the court found properly that the procedures employed were not impermissibly suggestive.

III.

We address first appellant's argument that the court erred by admitting inadmissible hearsay evidence when it permitted Detective Batavick to explain how he arrived at appellant's residence by testifying to specific information that a cell phone carrier provided him. We disagree with appellant.

Hearsay constitutes "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Md. Rule 5-801(c). In the absence of an exception to the general rule, hearsay is inadmissible at trial. Rule 5-802. Whether evidence is hearsay is reviewed *de novo*. *Parker v. State*, 408 Md. 428, 436, 970 A.2d 320, 325 (2009).

Generally, an out-of-court statement is admissible as non-hearsay if it is offered for the purpose of showing that a person relied and acted upon the statement, rather than for the

9

purpose of showing that the facts elicited in the statement are true. *Purvis v. State*, 27 Md. App. 713, 716, 343 A.2d 898, 900 (1975). In the context of an officer explaining why he or she arrived at a particular location, the officer "should not be put in a false position of seeming to have just happened upon the scene; he should be allowed some explanation of his presence and conduct." *McCray v. State*, 84 Md. App. 513, 518, 581 A.2d 45, 47 (1990). The officer's explanation, however, must not include "contemporaneous and specific information about the defendant's clothing, location, and activity, [as] it can be highly persuasive as to the defendant's actual guilt of the crime charged, even without a name." *Parker v. State*, 408 Md. at 443, 970 A.2d at 329. Doing so would contaminate the out-of-court statement explaining the officer's presence at the location and render the statement inadmissible. *See Purvis*, 27 Md. App. at 718-19, 343 A.2d at 901-02 (finding that an explanation by a testifying officer that relates specific information identifying the accused as the assailant "is so likely to be misused by the jury as evidence of the fact asserted that it should be excluded as hearsay").

The record in the instant matter indicates that the detective's testimony referenced improperly specific out-of-court information that connected appellant to the underlying robbery. Detective Batavick testified that the cell phone carrier provided him with a "name and address" for a phone number that he obtained from Craigslist. He explained that the contact information he received from the cell phone carrier led him to appellant's residence. The detective's testimony allowed the jury to connect appellant to the Craigslist

10

advertisement, which was the ruse that appellant devised to rob the Kaleems. That appellant used Craigslist to lure the victims to his home and rob them is the very object that the State undertook to establish at trial. The detective's testimony is highly persuasive and likely to be misused by the jury because it speaks directly to appellant's guilt as to the charges against him. Accordingly, we find that Detective Batavick's testimony contained inadmissible hearsay.

We shift our inquiry to the trial court's response to the objectionable testimony and hold that the court acted properly. The detective stated first that he contacted the cell phone carrier and they "provided a number that carried a list." Defense counsel objected. The court limited implicitly the witness's testimony by instructing him that he could state that he contacted the cell phone carrier. Defense counsel did not move to strike the remaining part of the detective's testimony and the State continued its examination. Subsequently, Detective Batavick testified that the carrier "provided [the police] with a name and address" to the phone number obtained from Craigslist. Defense counsel objected and the court identified the testimony as inadmissible hearsay, *sustained* defense counsel's objection and struck the testimony. Appellant did not move to strike the testimony nor did he move for a mistrial. The court *sua sponte* provided the remedy of striking the inadmissible testimony. Moreover, at the close of all the evidence, the court instructed the jury that stricken testimony is not to be considered as evidence. *See Klauenberg v. State*, 355 Md. 528, 545-46, 735 A.2d 1061, 1070-71 (1999) (holding that there was no error where appellant's objections were sustained,

11

testimony stricken and finding relevant the fact the court instructed the jury to disregard stricken evidence). It is clear that appellant received all the relief that he sought with respect to the inadmissible testimony and hence, we find no error. *See Hyman v. State*, 158 Md. App. 618, 631, 857 A.2d 1166, 1173 (2004) (noting that after the trial court sustained the objection, "appellant did not request further relief at trial; he did not ask the court to strike the statement, that a curative instruction be given, or that a mistrial be granted" and thus, he "effectively waived all other potential review on appeal").

IV.

We turn next to appellant's argument that the motions court erred in denying his motion to suppress pre-trial photographic identifications. We disagree with appellant.

In reviewing the court's decision to deny appellant's motion to suppress, ordinarily, we consider only the record of the suppression hearing and not the evidence at trial. *Prioleau v. State*, 411 Md. 629, 638, 984 A.2d 851, 856 (2009). We review the evidence presented at the suppression hearing in the light most favorable to the prevailing party. *Id*. We extend great deference to the factual findings of the suppression judge with respect to determinations about witness credibility. *McCain v. State*, 194 Md. App. 252, 267, 4 A.3d 53, 61 (2010). The suppression judge's findings on witness credibility will not be disturbed unless clearly erroneous. *Id*.

12

In the context of pre-trial identifications, we are mindful that due process principles apply to protect against the admission of identifications obtained through unnecessarily suggestive police procedures. *James v. State*, 191 Md. App. 233, 251-52, 991 A.2d 233, 132-33 (2010). In doing so, we apply a two-step inquiry to determine the admissibility of identifications alleged to be the product of impermissibly suggestive procedures. *Id*. First, the burden falls on the accused to establish that the procedures employed by the police were impermissibly suggestive. *Id*.; *see Thomas v. State*, 213 Md. App. 388, 416-17, 74 A.3d 746, 763-64 (2013)(noting that the defense "must show some unnecessary suggestiveness in the procedures employed by the police"). If the accused demonstrates that the identification was tainted by suggestiveness, the burden shifts to the State to prove by clear and convincing evidence that the reliability of the identification outweighs "the corrupting effect of the suggestive procedure." *Thomas v. State*, 139 Md. App. 188, 208, 775 A.2d 406, 418 (2001). The linchpin of the analysis is the reliability of the identification. *James*, 191 Md. App. at 252, 991 A.2d at 133. If the accused fails to carry his or her burden demonstrating impermissibly suggestive police procedures, however, our inquiry ends and the identification is deemed reliable. *Id*.

We determine first whether the procedures employed by the police to obtain the identifications were impermissibly suggestive. Judge Charles Moylan, Jr., writing for this Court discussed at length the concept of impermissibly suggestive police procedures.

13

*Conyers v. State*, 115 Md. App. 114, 121, 691 A.2d 802, 806 (1997). He explained as

follows:

> "Impermissibly suggestive police misbehavior . . . is not a category that embraces every variety of police misbehavior . . . . To do something impermissibly suggestive is not to pressure or to browbeat a witness to make an identification but only to feed the witness clues as to which identification to make. THE SIN IS TO CONTAMINATE THE TEST BY SLIPPING THE ANSWER TO THE TESTEE. All other improprieties are beside the point."

*Id*.; *see Jenkins v. State*, 146 Md. App. 83, 126, 806 A.2d 682, 706-07 (2002), *rev'd on other*

*grounds*, 375 Md. 284, 825 A.2d 1008 (2003)(citing the standard announced in *Conyers* and

noting that "the scope of identification procedures constituting 'impermissible

suggestiveness' is extremely narrow"). Thus, it is not a Due Process violation *per se* that an

identification procedure is suggestive. *State v. Hailes*, _ Md. App. _, slip op. at 59, (filed

May 27, 2014). The procedure must be *impermissibly* suggestive and it is the

impermissibility of the police procedure that warrants exclusion. *Id*.

At the outset, we note that the investigating officer in the case *sub judice* did not

follow proper police procedures by placing Taha and Javeria in the same room to view the

photo book. In 1999, the United States Department of Justice (the DOJ) developed a guide

for law enforcement agencies to utilize in obtaining accurate eyewitness evidence. U.S.

Dept. of Justice, Eyewitness Evidence: A Guide for Law Enforcement (1999) [hereinafter

*DOJ Standards*]. The DOJ instructs that the proper procedure for showing a witness a photo

book, or, a "mug book," requires first that the investigating officer "provide instructions to

14

the witness prior to conducting the procedure." *DOJ Standards* at 19. Among other advisements, the officer should "[i]nstruct each witness *without other persons present*." *Id.* (emphasis added). Law enforcement agencies in Maryland are required to comply with the DOJ's standards. *See* Maryland Code (2003, 2011 Repl. Vol.) § 3-506(a) of the Public Safety Article[4] (requiring law enforcement agencies in this State to adopt written polices relating to eyewitness identifications that comply with the United States Department of Justice standards on obtaining accurate eyewitness identifications).

On April 14, 2014, the General Assembly amended § 3-506. S.B. 860, 2014 Maryland Laws, Reg. Sess. (Md. 2014). Effective October 1, 2014, law enforcement agencies must comply with additional statutory safeguards in conducting eyewitness identifications. *Id.* The amended provision requires law enforcement agencies across Maryland to adopt the Police Training Commissions's Eyewitness Identification Model Policy, or, to adopt polices as promulgated by the statute. *Id.* Among other requirements, the statute mandates that, if there are multiple eyewitnesses, "the identification procedure shall be conducted separately for each eyewitness." *Id.*

It is clear that the reliability of eyewitness identifications is of paramount concern to the people of this State, as it should be. We note that law enforcement agencies should not take lightly the procedures employed to obtain eyewitness identifications. The failure to do

---

[4]Unless otherwise indicated, all subsequent statutory references herein shall be to the Public Safety Article.

so may result in grave consequences. In many instances, a witness's identification of the accused may be the feather that tips the scale in favor of conviction.

In the instant matter, Detective Batavick did not follow the DOJ's standards when he placed Taha and Javeria in the same room to view the photo book. Although he instructed the witnesses prior to showing them the photo book, the detective should have shown the witnesses the photo book separately.

Notwithstanding the impropriety of placing Taha and Javeria in the same room to view the photo book, the police procedures did not rise to the level of impermissible suggestiveness to warrant exclusion of the identifications. Detective Batavick showed the photo book individually to the witnesses and instructed them not to communicate with one another. As he sat outside of the room with the door ajar, the detective observed that the children did not violate his instruction. He testified that, to his knowledge, neither he nor any other officer told Taha or Javeria whom to select from the photo book. Moreover, Taha and Javeria selected *two* individuals from the photo book who had "similar features" to the assailant. Neither child asserted that either of the individuals they selected was, in fact, the person who robbed them.

In *In re Tyquan W.*, 82 A.D.3d 1255 (N.Y. App. Div. 2011), the Appellate Division of the Supreme Court of New York faced a similar situation to the instant matter. In that case, the police put two witnesses to the crime in the same room to view a photo book. The first witness identified the defendant. After the second witness saw and heard the first

16

witness identify the defendant, she viewed the photo book and identified the defendant as well. The defendant claimed that that identifications should be suppressed because the procedure employed was impermissibly suggestive. Because the evidence established that the witnesses communicated *before* the second witness made an identification, the court upheld the suppression of the second witness's identification, but permitted the first witness's identification. *In re Tyquan W.*, 82 A.D.3d at 1256. The court did not find compelling the argument that placing the witnesses in the same room was sufficient, by itself, to taint the first witness's identification. *See id*. *See also People v. Rodriguez*, 17 A.D.3d 1127, 1129 (N.Y. App. Div. 2005) ("[T]he fact that a witness viewed the photo array while a second witness was in the room did not taint the witness's identification of defendant's photograph in the photo array.").

The case *sub judice* is similar, in some respects, to *In re Tyquan*. Both Taha and Javeria were in the same room when they viewed independently the photo book. What emerges from the New York case is that the procedure of placing two witnesses in the same room to view a photo book, although improper, is not *per se* suggestive. As to the evidence of communication between the witnesses, we find it compelling that, contrary to Javeria, Taha testified that he and his sister did not communicate during the procedure. We resolve conflicts in testimony at the suppression hearing in the light most favorable to the prevailing party–in this case, the State. *See Prioleau*, 411 Md. at 638 ("We review the evidence and the inferences that may be reasonably drawn in the light most favorable to the prevailing party.").

17

Moreover, unlike the witnesses in *In re Tyquan*, neither Taha nor Javeria identified appellant as the person who robbed them after viewing the photo book. They selected two photographs of individuals with similar features to the assailant. Javeria acknowledged that she selected the photos on her own accord and that the police did not influence her decision in any way. Taha echoed this sentiment. Accordingly, the suppression hearing record is devoid of evidence to suggest that the officers "slipped" the answer to the witnesses or that the fact that the two witnesses viewed the photo book in the same room tainted their identifications.

Appellant argues further that the identification procedure was impermissibly suggestive because the photo array was misleading. He contends that it was impermissibly suggestive to include his photo in the photo array, which the police presented to the Kaleems for a second identification, without including the photo of the other individual that Taha and Javeria selected at the police station from the photo book. That the police included appellant's photo for a second time without including the photo of the other potential suspect could be impermissibly suggestive if the record demonstrated that there was some reason for the witnesses to notice it. *See Jenkins*, 146 Md. App. at 128, 806 A.2d at 708 (noting that while it may be a factor that only appellant was included in both a photo array and a line-up identification, the procedure "would only be suggestive if there was some reason for [the witness] to notice it").

In the instant matter, there is nothing in the record to suggest that the witnesses had any reason to notice the repeated use of appellant's photograph. Detective Batavick testified

18

that the police generated additional evidence that made appellant their primary suspect. As such, the officers used a more recent photo of appellant than the one found in the photo book[5] and utilized a computer imaging database to compile individuals matching appellant's facial features to create the photo array. The witnesses reviewed independently the photo array and identified appellant as the person that had robbed them on February 22, 2013.[6] Taha indicated the person in the photograph that he selected had a similar nose, mouth, color of skin and hairstyle as the assailant. Javeria and Sahid selected the photograph of appellant and stated "that's him," without further explanation. While we agree that it was a factor that appellant was the only suspect to appear in both the photo book and the photo array, nothing the witnesses said or did indicates that the reason they selected appellant's photograph was because they had seen it before or because they had some reason to notice it. Because we find that the identification procedures employed by the police were not impermissibly suggestive, our inquiry ends. The suppression court did not err by denying appellant's motion to suppress.

---

[5] Detective Batavick indicated that the photograph of appellant in the photo array had more facial hair and that appellant looked "quite a bit" older than the photograph included in the photo book.

[6] Appellant claims that the officers told Javeria that "she had to pick one [photograph] and sign it on the back." On cross-examination, however, Javeria testified that Detective Batavick did not tell her which picture to select and that she made the selection on her own.

19

**JUDGMENTS OF THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY AFFIRMED. COSTS TO BE PAID BY APPELLANT.**